## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA

◆

## CASE NO. 22-CV-62325

ANDREA RATFIELD, an individual,
ANN MARIE KELLY, an individual,
BRIAN RAY, an individual,
COURTNEY MELL, an individual,
JEREMY GERHOLD, an individual,
JEROME POWELL, an individual,
JESICA THOMPSON, an individual,
JOE TEETER, an individual,
KATHLEEN SMADES, an individual,
MATT DACIER, an individual,
MICHAEL DANFORD, an individual,
RICHARD SPINDLER, an individual,
STEPHEN DUCKER, MD, an individual,
WILLIAM GUBA, an individual,

     *Plaintiffs*,

-vs-

UNITED STATES DRUG TESTING LABORATORIES, INC.,
     an Illinois For-Profit Corporation,
DOUGLAS LEWIS,
     an individual,
JOSEPH JONES,
     an individual,
Michelle Lach,
     an individual,

     *Defendants.*

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

_____

## INTRODUCTION

The plaintiffs are a group of professionals—mostly pilots, but including at least lawyer and one medical doctor—that are victims of fraud and negligence. They have had their lives turned upside down based on the results of an insufficiently validated, unreliable methodology masquerading as science. The defendants' misconduct regarding their dried blood spot ("DBS") testing scheme—which purports to ascertain levels of phosphatidylethanol ("PEth"), a biomarker of alcohol—lies at the heart of it all. All allegations herein are to be read as at all times material.

## THE PARTIES

*THE PLAINTIFFS*

1.   Andrea Ratfield is a resident of Minnesota.

2.   Courtney Mell is a resident of Palm Beach County, Florida.

3.   Richard Spindler is a resident of Palm Beach County, Florida.

4.   Kathleen Smades is a resident of Pinellas County, Florida.

5.   Stephen Ducker, MD, is a resident of Sarasota County, Florida.

6.   Ann Marie Kelly is a resident of Colorado.

7.   Brian Ray is a resident of Texas.

8.   Jeremy Gerhold is a resident of Texas.

9.  Jerome Powell is a resident of Georgia.

10.  Jesica Thompson is a resident of New Hampshire.

11.  Joseph Teeter is a resident of Ohio.

12.  Matthew Dacier is a resident of New Hampshire.

13.  Michael Danford is a resident of Tennessee.

14.  William Guba is a resident of Texas.

(collectively, "Plaintiffs")

15.  All Plaintiffs are *sui juris*.

THE DEFENDANTS

16.  United States Drug Testing Laboratories, Inc. ("USDTL") is a for-profit Illinois corporation with its principal place of business is in Illinois.

17.  USDTL is a business-to-business specimen testing laboratory that does substantial business with, and depends on more than 50 partners or clients, in Florida, including, but not limited to:

a.  Lab Express LLC, 814 SW Pine Island Road, Suite 306, Cape Coral, Florida 33991;

b.  Fastest Labs of Clearwater, 13555 Automobile Blvd., Suite 550, Clearwater, Florida 33762;

c.  ARCpoint Labs of Weston, 16210 Indian Trace, Weston, Florida 33326;

d.  Fastest Labs of Fort Myers, 4110 Center Pointe Drive, Suite 201, Fort Myers, Florida 33916;

e.  ARCpoint Labs of Jupiter, 275 Toney Penna Drive, #11, Jupiter, Florida 33458;

f.  Any Lab Test Now (Melbourne), 145 Palm Bay Road NE, Suite 102, West Melbourne, FL 32904;

g.  ARCpoint Labs of Saint Augustine, 2744 US-1, St. Augustine, Florida, 32086;

h.  Any Lab Test Now (Panama City), 330 West 23rd Street, Suite H, Panama City, Florida 32405;

i.  Any Lab Test Now (North Jacksonville), 725 Skymarks Drive, Suite 8, Jacksonville, Florida 32218;

j.  Any Lab Test Now (Ormond Beach), 1425 Hand Avenue, Suite E, Ormond Beach, Florida 32174;

k.  Alcohol and Drug Test Florida, 3785 Airport Road, #B1, Naples, Florida 34105;

l.  ARCpoint Labs of Delray Beach, 4989 West Atlantic Avenue, Delray Beach, Florida 33445,

m. Accredited Drug Testing, 59531 Brick Ct., Suite 100, Winter Park, Florida 32792;

n. ARCpoint Labs of Fort Lauderdale (Central), 3221 Northwest 10th Terrace, Suite 508, Fort Lauderdale, Florida 33309;

o. Any Lab Test Now (Davie), 4343 S. State Road 7, Davie, Florida 33314;

p. Fastest Labs of North Palm Beach, 300 Prosperity Farms Road, North Palm Beach, Florida 33408;

q. Assurance Testing Services, 2207 S. Congress Avenue, Suite A, Palm Springs, Florida 33406;

r. Any Lab Test Now (Winter Park), 501 North Orlando Avenue, Suite 151, Winter Park, Florida 32789;

s. Drug and Alcohol Testing of America (DAATA), 4221 N. Himes Avenue, Suite 103, Tampa, Florida 33607;

t. Any Lab Test Now (Pensacola), 4761-2 Bayou Blvd., Pensacola, Florida 32503;

u. Fastest Labs of Pensacola, 600 University Office Blvd., Bldg. 8, Suite 8A, Pensacola, Florida 32504;

v. Any Lab Test Now (Jacksonville South), 9965 San Jose Blvd., Suite 30, Jacksonville, Florida 32257;

w. Drug Testing Service Center, 1482 S. Palm Avenue, Pembroke Pines, Florida 33025;

x. ARCpoint Labs of Miami South, 7305 S. West 107th, Miami, Florida 33173;

y. On Site Medical Services, 813 E. Michigan Street, Orlando, Florida 32806;

z. Any Lab Test Now (Jacksonville), 13170 Atlantic Blvd., Unit 60, Jacksonville, Florida 32225;

aa.     ARCpoint Labs of Fort Lauderdale, 5201 Ravenswood Road, Suite 121, Florida 33312;

bb.     ARCpoint Labs of Jacksonville, 6639 South Point Parkway, Suite 106, Jacksonville, Florida 32216;

cc. ARCpoint Labs of Sasrasota, 3410 Magic Oak Lane, Sarasota, Florida 34232;

dd.     ARCpoint Labs of Fort Myers, 4350 Fowler Street, Suite 2, Fort Myers, Florida 33901;

ee.     Peace of Mind Drug and Background Screen, 4500 140 Avenue N., Suite 210, Clearwater, Florida 33764;

ff. Tru Care Labs, Inc., 3520 N. Monroe Street, Tallahassee, Florida 32303;

gg.     Truth Verification Labs, Inc., 1648 Taylor Road, #303, Port Orange, Florida 32128;

hh.      ARCpoint Labs of Altamonte Springs, 774 Northlake Blvd., Suite 1008, Florida, 32701;

ii.   The Testing Center, 3900 NW 79th Avenue, #440, Miami, Florida 33166;

jj. Center for Drug Free Living, 320 W. Grant Street, Orlando, Florida 32806;

kk. Access Recovery Solutions, 277 Forest Park Circle, Panama City, Florida 32405;

ll. ARCpoint Labs of Orange Park, 1560 Wells Road, Suite 1, Orange Park, Florida 32073;

mm.     Any Lab Test Now (Pensacola), 4761-2 Bayou Blvd., Pensacola, Florida 32503;

nn.      Any Lab Est Now (Fort Myers), 13401-9 Summerlin Road, Fort Myers, Florida 33919;

oo.      Any Lab Test Now (Wesley Chapel), 27421 Wesley Chapel Blvd., Wesley Chapel, Florida 33544;

pp.      Centurion Testing Service, LLC, 2512 Ironwood, Drive, Jacksonville, Florida 32216;

qq.      Fifth Street Counseling, 4121 NW 5th Street, Suite 206, Plantation, Florida 33317;

rr. DNA Profile Inc., 1509 NE 167 Street, North Miami Beach, Florida 33167;

ss. Exam Plus FL Corp., 1511 E. State Road 434, Suite 2001, Winter Springs, Florida 32708;

tt. Any Lab Test Now (Ocoee), 8975 West Colonial Drive, Ocoee, Florida 34761;

uu. National Drug Screening, Inc., 2101 Waverly Place, Suite 200D, Melbourne, Florida 32901;

vv. Live Scan Labs, 3107 Hallandale Beach Blvd., Suite 104, Pembroke Park, Florida 33009;

ww. ARCpoint Labs of North Tampa, 2901 W. Busch Blvd., Suite #206, Tampa, Florida 33618;

xx. Any Lab Test Now (Orlando), 570 N. Alafaya Trail, #116, Orlando, Florida 32828;

yy. ARCpoint Labs of West Palm Beach, 5601 Corporate Way, Suite 108, West Palm Beach, Florida 33407;

zz. Drug Free Workforce, 9781 Wayne Avenue, Miami, Florida 33157;

aaa. One Source Screening Solutions, 5700 Lake Worth Road 100, Greenacres, Florida 33463;

bbb.　　On Site Medical Services, Inc., 813 E. Michigan Street, Orlando, Florida 32806; and,

ccc.　　Fastest Labs of Orlando, 2415 W. Sand Lake Road, Suite F-2, Orlando, Florida 32809.

18.　　Douglas Lewis, D.Sc., is USDTL's Founder, President, and Scientific Director. He is *sui juris* and a resident of Illinois.

19.　　Joseph Jones, Ph.D, is USDTL's COO and Executive VP. He is *sui juris* and, based on information and belief, a resident of Illinois.

20.　　Michelle Lach, MSIMC, is USDTL's Director of Communications. She is *sui juris* and, based on information and belief, a resident of Illinois.

### JURISDICTION AND VENUE

21.　　This Court has subject matter jurisdiction based on diversity. The amount in controversy for each plaintiff exceeds $75,000 (exclusive of interest and costs) and the parties are citizens of different states.

22.　　This Court has personal jurisdiction over the defendants because:

a. they availed themselves of the privilege of doing business in Florida;

b. there are sufficient minimum contacts to haul them into any court in Florida for a litigated dispute;

c. products, materials, or things processed, serviced, designed, manufactured or marketed by them were used in the ordinary course of commerce, trade, or use and caused injury to Plaintiffs within Florida arising out of their acts and omissions.

d. plaintiffs' injuries, harms, and losses arise out of their deliberate use of their DBS PETh collection and testing products, many of which were sent to collection sites and/or clients in Florida.

e. they engaged in substantial activity in Florida;

f. they contracted with entities of or operating in Florida;

g. they promoted their services to entities of or operating in Florida;

h. they had continuous business dealings with entities of or operating in Florida;

i. their business-to-business specimen testing laboratory designed, developed, marketed, sold, and shipped DBS tests— at times "at no extra charge"—purportedly capable of accurately and reliably measuring levels of PEth to collection sites, laboratories, partners, clients, and/or entities of or in Florida for the collection and/or analysis of specimens.

j. they had a continuous relationship with collection sites and/or laboratories located in Florida whereby they collected DBS PEth

specimens and shipped them to USDTL for testing and analysis.

k. they own and maintain the website www.usdtl.com, which lists many "Collector Locations" in Florida where DBS PEth tests are not only administered, but often the collection supplies are shipped at no extra cost. <u>See, e.g.</u>, https://www.usdtl.com/collection/supplies-2

23.    Venue is proper because a substantial part of the events or omissions giving rise to the claims asserted below occurred within this district, and even if assumed otherwise, the defendants are subject to this Court's personal jurisdiction with respect to this action.

24.    The Plaintiff's claims are timely under the controlling statutes of limitations and/or repose, and governing caselaw, and all conditions precedent, if any, have been satisfied or otherwise waived by defendants.

### FACTS COMMON TO ALL COUNTS

---◆---

#### *PHOSPHATIDYLETHANOL (PETH)*

25.    PEth is a group of phospholipids formed in cell membranes by an enzymatic reaction between ethanol and phosphatidylcholine.

26.    PEth is believed by some to be a direct biomarker for alcohol consumption.

27.    PEth is believed to have a long elimination half-life of ~5-10 days.

28.     PEth's phospholipids accumulate in red blood cells.

***Dried Blood Spot ("DBS") Tests***

29.     DBS testing is a minimally invasive micro-sampling method.

30.     Unlike venipuncture, DBS collection is performed by the individual being tested (the donor).

31.     According to the defendants' the other person involved, sometimes referred to as the collector, is really just supposed to be an observer of the donor self-collecting.

32.     However, more often than not, if not always, the collector did, in fact, prick the Plaintiffs'-donors' finger(s) and collect the sample, not the Plaintiffs-donors themselves.

33.     The collector-observer is supposed to receive a short training session before permitting a donor to collect a DBS PEth sample.

34.     All Plaintiffs were subjected to at least one DBS PEth collection and analysis protocol. Most, if not all, were subjected more than once.

35.     Based on information and belief, Plaintiff Ratfield's first USDTL DBS PEth sample was provided in or around November 2019.

36.     Based on information and belief, Plaintiff Kelley's first USDTL DBS PEth sample was provided in or around March 2020.

37.     Based on information and belief, Plaintiff Ray's first USDTL DBS

PEth sample was provided in or around April 2020.

38.   Based on information and belief, Plaintiff Mell's first USDTL DBS PEth sample was provided in or around August 2020.

39.   Based on information and belief, Plaintiff Gerhold's first USDTL DBS PEth sample was provided in or around December 2021.

40.   Based on information and belief, Plaintiff Powell's first USDTL DBS PEth sample was provided in or around February 2022.

41.   Based on information and belief, Plaintiff Thompson's first USDTL DBS PEth sample was provided in or around August 2020.

42.   Based on information and belief, Plaintiff Teeter's first USDTL DBS PEth sample was provided in or around December 2021.

43.   Based on information and belief, Plaintiff Smades', an attorney admitted to the Florida Bar in October 1988, first USDTL DBS PEth sample was provided in or around December 2021.

44.   Based on information and belief, Plaintiff Dacier's first USDTL DBS PEth sample was provided in or around May 2020.

45.   Based on information and belief, Plaintiff Danford's first USDTL DBS PEth sample was provided in or around May 2018.

46.   Based on information and belief, Plaintiff Spindler's first USDTL DBS PEth sample was provided in or around March 2021.

47.     Based on information and belief, Plaintiff Ducker's first USDTL DBS PEth sample was provided in or around April 2016.

48.     Based on information and belief, Plaintiff Guba's first USDTL DBS PEth sample was provided in or around May 2020.

***USDTL Is the Only Commercial Lab Doing DBS PEth Test Analysis***

49.     USDTL's DBS measures a specific PEth species (16:0/18:1).

50.     USDTL claims to be the only commercial laboratory in the United States that performs DBS PEth testing.

51.     If true, there are no other labs to compare USDTL's operation to.

***The Defendants Don't Validate Their Process…On Purpose***

52.     USDTL claims to be Clinical Laboratory Improvement Amendments ("CLIA") certified and compliant.

53.     The purpose of CLIA is to ensure the accuracy and reliability of laboratory tests and the public health of all Americans.

54.     The Centers for Medicare & Medicaid Services ("CMS") regulates all non-research laboratory testing through CLIA.

55.     CMS certification of a laboratory under CLIA depends on whether the laboratory meets the statutory and regulatory conditions for certification.

56.     "The laboratory must establish and follow written policies and procedures that ensure positive identification and optimum integrity of a

patient's specimen from the time of collection or receipt of the specimen through completion of testing and reporting of results." 42 C.F.R. § 493.1232.

57.    USDTL has not conducted a validation study for its own unique collection process associated with DBS PEth.

58.    USDTL has not conducted a validation study or analyzed the impact of deviating from the procedures mandated by the laboratory.

59.    USDTL has not done a validation study to indicate the impact of pre- or post-collection variables, including, but not limited to, hand sanitizer, specimen collection process, sample volume effect, hematocrit effect, guanidinium salts, creatinine effect, volcano effect, or the shipment of a specimen without a desiccant pouch.

60.    USDTL's DBS PEth methodology is a non-standard, laboratory-specific procedure.

61.    A laboratory developed test can be submitted to the FDA for approval, but USDTL has purposely never done that.

62.    At all times material, the defendants knew or should have known that these validation studies were reasonably prudent—if not essential—especially in the post-Theranos world, but chose not to ever do them, or seek FDA approval, anyway.[1]

---

[1]    What is reported to have occurred with Theranos is not exactly what is alleged to

63.    The defendants also knew or should have known that in 2019 the *"Official International Association for Therapeutic Drug Monitoring and Clinical Toxicology Guideline"* published a guideline on the development and validation of DBS methods which stated that "to assure that the results obtained with those methods are valid, it is of utmost importance that newly developed methods are fit for purpose. Those methods must have undergone adequate method validation and are monitored through a suitable quality control (QC) program. Absence of DBS-specific method validation guidelines results in DBS-based methods lacking essential validation aspects resulting into reduced credibility."

### Failure to Reasonably Train or Oversee DBS PEth Collection

64.    The cards that USDTL's DBS uses for collection have 5 circles on them intended for the donor to provide 5 samples.

65.    USDTL then tests 2-3 of those circles.

66.    The un-tested circles are purportedly available for retest.

67.    However, if DBS samples are adulterated or compromised during collection, all 5 circles may be compromised or inadequate for use, rending the those circles preserved for re-testing useless.

---

be happening with USDTL and its executives here. But, broadly speaking, Theranos allegedly made certain false claims about its ability to ascertain certain things from small samples of blood, and these defendants are alleged to have done the same.

68.   The defendants claim that DBS PEth collection is performed by the donor, under observation, "after a short training session."[2]

69.   USDTL does not reasonably:

   a.  provide any training to donors on how to provide samples;

   b.  oversee a donor's provision of samples;

   c.  have a system or process in place to ascertain whether a donor has received any training at all;

   d.  provide any training to collectors-observers on how to observe donors to ensure collection protocol is complied with;

   e.  have a system or process in place to ascertain that retrieval, storage, packaging, and shipment of samples back to USDTL is done in compliance with USDTL instructions or protocol;

   f.  have a system or process in place to ascertain whether a collector-observer has any training at all.

70.   Instead, the defendants purposely maintain an arm's length relationship with all collection facilities and abdicates these responsibilities even though USDTL acknowledges in its DBS collection instructions that "it is imperative to follow the steps carefully in order to ensure a proper

---

[2]   https://www.usdtl.com/testing/peth-alcohol-test-labs.

specimen collection."[3]

### Misrepresentations About DBS PEth & Hand Sanitizer

71. In "*Chromatography and the History of Direct Alcohol Biomarkers*," a 45 minutes and 16 seconds video on USDTL's YouTube channel since January 2015, Lewis said that a donor would have to consume enough hand sanitizer to literally get intoxicated by it, or perhaps bath in a vat of it, for hand sanitizer to affect DBS PEth results.

72. In that same video Lewis states that USDTL has never measured PEth in anyone who started with 0 and then used hand sanitizer, and that it's next to impossible to fathom it.

73. On the FAQ section of USDTL's website, USDTL claims that incidental exposure to hand sanitizers cannot affect DBS PEth tests, even though USDTL knows it can affect EtG in urine tests.

74. Nevertheless, *the very first* instruction in USDTL's DBS PEth collection instructions reads: "1. Collector and donor should wash their hands with soap and water. **CAUTION: Do not use an ethanol-based sanitizer**."

75. In *ToxTime: Phosphatidyethanol Recent Developments*," a 36 minute and 15 second video on USDTL's YouTube channel since December

---

[3]    https://www.usdtl.com/wp-content/uploads/DBS_Collection_Instructions2020.07.14.pdf.

2020, Jones acknowledged that while a small group of 4 volunteers was recently studied, USDTL did not, as of that video, have a statistically significant enough population studied to know whether they could "rule in or rule out" any effects of hand sanitizer.

***Misrepresentations About What USDTL's DBS PEth Ascertains***

76.     The defendants have knowingly, falsely, and/or carelessly claimed that DBS PEth tests for abstinence from alcohol:

> a.  In "*ToxTime: Phosphatidyethanol Recent Developments*," a 36 minute and 15 second video on USDTL's YouTube channel since December 2020, Jones described DBS PEth as "an important tool for monitoring abstinence."[4]
>
> b.  In "*ToxTime: Phosphatidyethanol Recent Developments*," a 36 minute and 15 second video on USDTL's YouTube channel since December 2020, Jones said that with DBS PEth "we're monitoring for abstinence and so the level found is largely irrelevant as any positive result means they were not abstinent."[5]
>
> c.  In a "*ToxTime: Phosphatidyethanol (PEth) Overview,*" a 11

---

[4]     https://www.usdtl.com/media/peth-resources.
         https://www.youtube.com/watch?v=LfsR1p87res&t=1s.
[5]     https://www.usdtl.com/media/peth-resources.
         https://www.youtube.com/watch?v=LfsR1p87res&t=1s.

minute and 46 second video on USDTL's YouTube channel since August 2022, Jones explains that USDTL clients include treatment facilities, license issuers, schools, and courts (specifically child custody cases and probation/parole violations) who want to test for abstinence and use their tests as "decision makers."[6]

77.    Lewis, USDTL's founder, has admitted that urine EtG, *not* DBS PEth, is the closest thing to an abstinence from alcohol test.[7]

78.    The defendants have knowingly, falsely, and/or carelessly claimed their DBS PEth tests for hazardous or binge drinking:

   a. In "*A Moment in Time*" on USDTL's website, they say or adopt that PEth "identifies hazardous drinking levels (enough to raise blood alcohol levels up to or above 0.08% blood alcohol concentration)."[8]

   b. In "*Drug Testing, the Technology of Recovery for Professional Health Monitoring Programs*" on USDTL's website, they say or adopt that "PEth is a unique direct alcohol biomarker for

---

[6]    https://www.usdtl.com/media/peth-resources.
       https://www.youtube.com/watch?v=4Z79z6WKLjU.
[7]    https://www.usdtl.com/media/peth-resources.
       https://www.youtube.com/watch?v=OhmIv8g_w-c&t=1s.
[8]    https://www.usdtl.com/media/mediaarticles/a-moment-in-time.

binge drinking."[9]

   c.  In "*Made in the Blood*" on USDTL's website, they say or adopt that "PEth testing is able to detect binge alcohol consumption."[10]

   d.  In *"Breaking the Blood Barrier"* on USDTL's website they say or adopt that it "detects episodic heavy drinking (5 or more drinks in one sitting)."[11]

   e.  The Adult PEth Testing portion of USDTL's website (Testing Details>FAQ section) says "it requires multiple servings of ethanol on a single occasion to produce a positive PEth result".[12]

   f.  In "*Chromatography and the History of Direct Alcohol Biomarkers*," a 45 minutes and 16 seconds video on USDTL's YouTube channel since January 2015, Lewis explains that PEth requires a minimum of a binge, a 6-drink binge."[13]

   g.  In "*Why Test for PEth in blood?,*" a 3 minute and 41 second

---

[9]     https://www.usdtl.com/media/mediaarticles/drug-testing-the-technology-of-recovery-for-professional-health-monitoring-programs.

[10]    https://www.usdtl.com/media/mediaarticles/made-in-the-blood.

[11]    https://www.usdtl.com/media/mediaarticles/breaking-the-blood-barrier; https://issuu.com/usdtl/docs/neotox_fall_2015_for_web/4.

[12]    https://www.usdtl.com/testing/peth-alcohol-test-labs.

[13]    https://www.usdtl.com/media/peth-resources. https://www.youtube.com/watch?v=yJLzsf7qigg&t=11s.

video on USDTL's YouTube channel since June 2012, Lewis

explains that it takes a binge of an average of 6 drinks to give

a positive PEth test.[14]

79.    However, on the FAQ section of their website, they admit that

their DBS PEth tests cannot determine the dose or frequency of alcohol use.

**Misrepresentations About How Far DBS PEth Can Lookback**

80.    On the FAQ section of their website, the defendants claim or

adopt that DBS PEth cannot determine the time or frequency of alcohol use.

81.    The defendants have knowingly, falsely, and/or carelessly

claimed that the lookback window for USDTL's DBS PEth is up to 4 weeks:

a.  USDTL Website > Adult PEth Testing.[15]

b.  In "*ToxTime: Phosphatidyethanol Recent Developments*," 36

minutes and 15 seconds video on USDTL's YouTube channel

since December 2020 (Jones).[16]

82.    Other times the defendants have knowingly, falsely, and/or

carelessly claimed the lookback window for USDTL's DBS PEth is only up to

3 weeks:

---

[14]    https://www.usdtl.com/media/peth-resources.
       https://www.youtube.com/watch?v=OhmIv8g_w-c&t=1s.
[15]    https://www.usdtl.com/testing/peth-alcohol-test-labs.
[16]    https://www.usdtl.com/media/peth-resources.
       https://www.youtube.com/watch?v=LfsR1p87res&t=1s.

a. In "*Why Test for PEth in blood?*" a 3 minutes and 41 seconds video on USDTL's YouTube channel since June 2012 (Lewis).[17]

b. In "*Chromatography and the History of Direct Alcohol Biomarkers*," a 45 minutes and 16 seconds video on USDTL's YouTube channel since January 2015 (Lewis).[18]

c. In "*Alcohol (EtOH) Biomarkers*," a 1 hour, 2 minutes, and 41 second video on USDTL's YouTube channel since November 2014 (Lewis).[19]

d. "*A Moment in Time*" on their website.[20]

e. "*Drug Testing, the Technology of Recovery for Professional Health Monitoring Programs*" on their website.[21]

f. "*Made in the Blood*" on their website.[22]

**Misrepresentations About Drying Time Needed**

83.    The defendants' DBS PEth kits utilize Whatman 903 Specimen Collection Paper.

---

[17]    https://www.usdtl.com/media/peth-resources.
        https://www.youtube.com/watch?v=OhmIv8g_w-c&t=1s

[18]    https://www.usdtl.com/media/peth-resources.
        https://www.youtube.com/watch?v=yJLzsf7qigg&t=11s.

[19]    https://www.usdtl.com/media/peth-resources.
        https://www.youtube.com/watch?v=JfwGD4IK_Mg&t=3s.

[20]    https://www.usdtl.com/media/mediaarticles/a-moment-in-time.

[21]    https://www.usdtl.com/media/mediaarticles/drug-testing-the-technology-of-recovery-for-professional-health-monitoring-programs.

[22]    https://www.usdtl.com/media/mediaarticles/made-in-the-blood.

84.   The manufacturer of Whatman 903 Specimen Collection Paper calls for a drying time of three hours on a flat surface.

85.   But the defendants' collection instructions knowingly, falsely, and/or carelessly do not call for any drying time on a flat surface at all; instead, they instruct collectors-observers to "[p]lace the specimen card in drying box." Drying time isn't mentioned.

86.   The defendants have knowingly, falsely, and/or carelessly made similar claims in presentations and other marketing materials wherein they insists that no dry time is required at all.

87.   On their website, they knowingly, falsely, and/or carelessly claim that their "drying box makes collection even easier by eliminating wait time," but in their FAQ section simultaneously state, "you MUST allow the card to dry for one full hour."

88.   The defendants have, purposely and/or carelessly, never validated or researched the impact of deviating from the collection paper manufacturer's admonition on dry time.

89.   At all times material there was no scientifically reasonable reason to deviate from the paper manufacturer's instructions for wait time other than to make the collection process more convenient and expedient for collectors-observers (who either no longer wait at all or do not wait more than one hour).

### *Misrepresentations About Use of Plastic Bags & Desiccant Packs*

90.    The defendants' DBS PEth collection instructions call for the sealed drying box and custody form to be placed "in a *non-plasticized* envelope or other form of USDTL approved package. …**Caution: Do no place inside an airtight plastic specimen transport bag**."

91.    However, in the FAQ section of their website, when answering, "Can we put blood spot cards into a sealed plastic bag," they knowingly, falsely, and/or carelessly say, "Before placing blood spots into a sealed plastic bag, you MUST allow the card to dry for one full hour. Once dry, you *can* place dried blood spot cards in a *plastic bag* but you MUST include desiccant packs to reduce the moisture in the bag. It is highly recommended that the cards are placed in a non-plasticized envelope for transport when possible to avoid any issues with moisture." (underlining emphasis removed; caps in original; italics added).

92.    The defendants do not provide desiccant packs in the materials provided, nor is it listed in their DBS PEth instructions at any step.[23]

93.    The defendants purposely and/or carelessly do not provide desiccant packs because they know that should such a pack reveal

---

[23]    https://www.usdtl.com/wp-content/uploads/DBS_Collection_Instructions2020.07.14.pdf.

additional humidity, they would have to discard the sample card altogether.

94.     The defendants have purposely and/or carelessly not developed a system or protocol to ensure that their employees or agents who receive samples confirm that they were shipped in compliance with their expectations.

95.     The defendants have a pattern, practice, routine, and/or habit of accepting samples that they know or reasonably should know were collected and/or shipped in violation of their instructions or protocols.

### *There is No Evidence-Based Consensus on Cutoff Levels*

96.     What makes a DBS PEth sample "positive" or "negative"?

97.     It depends on what cutoff levels are used in the laboratory to indicate a positive test result.

   a. "*Drug Testing, the Technology of Recovery for Professional Health Monitoring Programs*" on USDTL's website.[24]

98.     The defendants knowingly, purposely, and/or carelessly utilize a 20 ng/mL cutoff.

99.     They know or reasonably should have known that their cutoff level is not supported by a convincing evidence base or consensus in the

---

[24]     https://www.usdtl.com/media/mediaarticles/drug-testing-the-technology-of-recovery-for-professional-health-monitoring-programs.

forensic, laboratory, or clinical scientific community.

100.  In an April 2020 research article co-authored by Jones titled, "*The Roles of Phosphatidylethanol, Ethyl Glucuronide, and Ethyl Sulfate in Identifying Alcohol Consumption Among Participants in Professionals Health Programs*," it was found that, "absent an evidence-based consensus on abstinence cutoffs for PEth and EtS, we were unable to assess the sensitivities and specificities of the biomarkers."

101.  That article also says, "it is unknown whether incidental alcohol exposures can produce suprathreshold PEth concentrations, given interindividual differences."

102.  USDTL's cutoff level of 20 ng/mL is arbitrary and was arbitrarily, knowingly, and/or carelessly chosen.

103.  When the defendants first tested DBS PEth in Uruguay, they got so many "positive" samples (compared to other immunoassays) that they thought something was wrong. They couldn't figure it out or explain why.

***Misrepresentations About Lack of False Positives***

104.  At all times material, the defendants knowingly, falsely, and/or carelessly claim(ed) their DBS PEth has no known false positives.

    a.  <u>See, e.g.</u>, *"Breaking the Blood Barrier"* on their website.[25]

---

[25]  https://www.usdtl.com/media/mediaarticles/breaking-the-blood-barrier;

105.   At all times material, the defendants knew, were aware of, and/or should have known or been aware of false positives by reports, claims, lawsuits, and/or internal investigations.

106.   Additionally, the defendants knew, were aware of, and/or should have known about external reports, claims, studies, and investigations revealing contributing factors to false positives.

107.   This includes, but is not limited to, recent studies that show, for example, that "vapors of alcohols during the blood spot drying process" are a possible source for false positives" and even conclude that "[e]xperiemtns with drying blood spots in alcohol vapor showed the influence on the PEth quantiation which cannot be ignored (the source of false positive results)" [a]lcohol-containiing means for sanitizing workplaces where DBS is drying should be removed due to influence on the sample and as a consequence on the PEth quantition." <u>See e.g.,</u> <u>False Positive Results of Phosphatidylethanol (PEth) Quantitation in Dried Blood Spots (DBS): The Influence of Alcohol Vapors</u>, September 7, 2022, https://www.mdpi.com/2297-8739/9/9/250.

108.   Despite their claims that there are no known false positives, the defendants knew, were aware of, and/or should have known or been aware

_____

https://issuu.com/usdtl/docs/neotox_fall_2015_for_web/4.

of many reasons why test results may be wrong (including showing as a false positive) or need further investigation (e.g., inconsistent cutoff standardization, lack of proper expertise, and unqualified or insufficiently trained personnel along the chain from collection through analysis).

109.   Nevertheless, the defendants knowingly, falsely, and/or careless claim that whereas other direct alcohol biomarkers like EtG and EtS found in urine and hair samples can "be problematic," their DBS PEth "does not suffer from any of these issues."

    a.   "*Made in the Blood*" on their website.[26]

110.   They also claim that it is impossible to adulterate a DBS sample.

    a.   "*Made in the Blood*" on their website.[27]

111.   The defendants also knowingly, falsely, and/or carelessly claim to have reviewed over 25,000 articles, none of which report anything other than consumption of ethanol resulting in PEth results in samples.

    a.   Adult PEth Testing>Testing Details>FAQ of their website.[28]

112.   But, at all times material, the defendants knew, were aware of, and/or should have known or been aware of that there were or are instances of something other than consumption of ethanol resulting in PEth results.

---

[26]   https://www.usdtl.com/media/mediaarticles/made-in-the-blood.
[27]   https://www.usdtl.com/media/mediaarticles/made-in-the-blood.
[28]   https://www.usdtl.com/testing/peth-alcohol-test-labs.

113.   The defendants also knew, were aware of, and/or should have known or been aware of that there are not even 25,000 articles studying whether anything other than consumption of ethanol creates PEth results.

114.   The defendants knowingly, falsely, and/or carelessly promoted studies they knew did not analyze whether something other than consumption of ethanol resulted in PEth results in samples for the proposition that something other than consumption of ethanol cannot result in PEth results in samples.

115.   The defendants knowingly, falsely, and/or carelessly claim that use of a product with isopropanol (rubbing alcohol) cannot explain a positive PEth result.

    a.  Adult PEth Testing>Testing Details>FAQ on their website.[29]

116.   At all times material, the defendants knew, were aware of, and/or should have known or been aware that they lacked sufficiently reliable data to make this representation or that it was untrue.

117.   The defendants knowingly, falsely, and/or carelessly claim that whereas studies indicate that low-level positive EtG/EtS results can be produced in urine samples by certain agents like hand sanitizers and mouth wash (incidental exposure), this is impossible with PEth tests.

---

[29]   https://www.usdtl.com/testing/peth-alcohol-test-labs.

a. Adult PEth Testing>Testing Details>FAQ on their website.[30]

118.   The defendants knowingly and/or carelessly don't have a system or process for internal review to determine whether it produces inconsistent results for donors over time, including, but not limited to, when separate samples from the same donor on the same day produce positive and negative results.

### Drug Testing is a Profit Center

119.   The defendants know drug/alcohol testing is a "profit center."

a. "*Drug Testing, the Technology of Recovery for Professional Health Monitoring Programs*" on their website.[31]

120.   They do commercial DBS PEth testing to generate profit.

121.   No other laboratories do commercial DBS PEth testing.

### Litigation Support for Clients

122.   The defendants know that some of their DBS PEth results are contested and, to protect their profit-generating methodology, offers to assist treatment facilities, license issuers, schools, airlines, and others who use their tests for determining abstinence or as other "decision makers."

123.   As part of this litigation support, the defendants provide litigation

---

[30]    https://www.usdtl.com/testing/peth-alcohol-test-labs.
[31]    https://www.usdtl.com/media/mediaarticles/drug-testing-the-technology-of-recovery-for-professional-health-monitoring-programs.

packages, letters of interpretation, and expert testimony.

### USDTL's YouTube Channel

124.   The defendants maintain a YouTube channel with the URL

https://www.youtube.com/c/Usdtl.

125.   They purposely turn off the ability for viewers to comment on any

of the content it uploads to that YouTube channel.

### Other Statements by Douglas Lewis

126.   Lewis is a "lab guy" that doesn't "deal with people."

   a.   "*Chromatography and the History of Direct Alcohol Biomarkers*,"

        a 45 minutes and 16 seconds video on USDTL's YouTube

        channel since January 2015.[32]

127.   Lewis "steal[s] ideas." He does not come up with them on his

own. He looks to others' research and tries to "weasel them into our work."

   a.   "*Chromatography and the History of Direct Alcohol Biomarkers*,"

        a 45 minutes and 16 seconds video on USDTL's YouTube

        channel since January 2015.[33]

128.   Lewis admits that if you cannot differentiate false positives from

---

[32]   https://www.usdtl.com/media/peth-resources.
        https://www.youtube.com/watch?v=yJLzsf7qigg&t=11s.
[33]   https://www.usdtl.com/media/peth-resources.
        https://www.youtube.com/watch?v=yJLzsf7qigg&t=11s.

real positives then, at best, the methodology used is "a very expensive screening test that needs to be confirmed by another method."

    a. "*Chromatography and the History of Direct Alcohol Biomarkers*," a 45 minutes and 16 seconds video on USDTL's YouTube channel since January 2015.[34]

129. Lewis has pattern, history, and modus operandi of being "gung-ho" about certain methodologies that look good at first but then, years later, realizing "oops" they're not.

    a. "*Chromatography and the History of Direct Alcohol Biomarkers*," a 45 minutes and 16 seconds video on USDTL's YouTube channel since January 2015.[35]

130. Lewis claims that DBS is "a gamechanger in the world of alcohol biomarkers."

    a. "*Chromatography and the History of Direct Alcohol Biomarkers*," a 45 minutes and 16 seconds video on USDTL's YouTube channel since January 2015.[36]

**Urine, Hair, and Nail EtG and EtS Tests**

---

[34]   https://www.usdtl.com/media/peth-resources.
     https://www.youtube.com/watch?v=yJLzsf7qiqg&t=11s.
[35]   https://www.usdtl.com/media/peth-resources.
     https://www.youtube.com/watch?v=yJLzsf7qiqg&t=11s.
[36]   https://www.usdtl.com/media/peth-resources.
     https://www.youtube.com/watch?v=yJLzsf7qiqg&t=11s.

131.  Ethyl glucuronide (EtG) and ethyl sulfate (EtS) are minor alcohol metabolites detectable in body fluids following alcohol consumption.

132.  In urine, EtG can be detected for 24 hours or more after one or two alcoholic beverages and for as long as 2–4 days after heavier use.

133.  Urine concentrations of these polar metabolites exceed those in blood and saliva.

134.  Hair differs from urine because of its ability to serve as a long-term storage vessel of foreign substances.

135.  Unlike hair concentration for drugs, EtG concentration in hair is not affected by hair color. However, EtG levels may vary among individuals, and factors that may contribute to such variability include but are not necessarily limited to gender, age and ethnic group.

136.  Nails (specifically toenails) are comparable and in some cases superior to hair in mean concentrations.

137.  EtG levels in both hair and nails may be affected by exposure to ethanol-containing products such as mouthwashes and hand sanitizers.

138.  Alcohol biomarkers in general should not be used as the only determinant of alcohol use, including potentially problematic use.

### COUNT I: FRAUD
(as to Defendant, United States Drug Testing Laboratories, Inc.)

139.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

140.  USDTL made false statements on its website, in marketing materials, and through its executives, regarding material facts about the purpose, reliability, and efficacy of its DBS PEth testing scheme.

141.  USDTL knew or should have known these statements were false.

142.  USDTL intended to induce collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, to rely and/or act on those statements and their DBS PEth testing scheme.

143.  Collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, relied and/or acted on those statements and used USDTL's DBS PEth testing scheme.

144.  As a direct, proximate, and foreseeable result, Plaintiffs suffered damages in justifiable reliance on USDTL's false statements and representations, including pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses

related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against United States Drug Testing Laboratories, Inc. for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT II: FRAUD
(as to Defendant, Douglas Lewis)

145.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

146.  Mr. Lewis made false statements regarding material facts about the purpose, reliability, and efficacy of USDTL's DBS PEth testing scheme.

147.  Mr. Lewis knew or should have known these statements were false.

148.  Mr. Lewis intended to induce USDTL's collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, to rely and/or act on those statements and use the DBS PEth testing scheme in order to generate revenue and, ultimately, profit which would result in his personal financial gain.

149. Collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, relied and/or acted on his statements and used USDTL's DBS PEth testing scheme.

150.  As a direct, proximate, and foreseeable result, Plaintiffs suffered damages in justifiable reliance on Mr. Lewis' false statements and representations, including pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Douglas Lewis for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

**COUNT III: FRAUD**
(as to Defendant, Joseph Jones)

151.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

152.  Dr. Jones made false statements regarding material facts about the purpose, reliability, and efficacy of USDTL's DBS PEth testing scheme.

153.  Dr. Jones knew or should have known these statements were false.

154.  Dr. Jones intended to induce USDTL's collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, to rely and/or act on those statements and use the DBS PEth testing scheme in order to generate revenue and, ultimately, profit which would result in his personal financial gain.

155.  Collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, relied and/or acted on his statements and used USDTL's DBS PEth testing scheme.

156.  As a direct, proximate, and foreseeable result, Plaintiffs suffered damages in justifiable reliance on Mr. Lewis' false statements and representations, including pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses

related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Joseph Jones for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT IV: FRAUD
### (as to Defendant, Michelle Lach)

157.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

158.  Ms. Lach controlled the content that was published on USDTL's website, YouTube and other online media channels and outlets, and written materials.

159.  Ms. Lach knew of USDTL's and/or Mr. Lewis' and/or Dr. Jones' false statements regarding material facts about the purpose, reliability, and efficacy of USDTL's DBS PEth testing scheme, but nevertheless published and promoted them by whatever means possible.

160.  Ms. Lach knew or should have known these statements were false.

161.  Ms. Lach intended to induce USDTL's collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, to rely and/or act on those statements and use the DBS PEth

testing scheme in order to generate revenue and, ultimately, profit which would result in her personal financial gain.

162. Collection sites, partners, clients, agencies, governments, employers, courts, and people, including Plaintiffs, relied and/or acted on his statements and used USDTL's DBS PEth testing scheme.

163. As a direct, proximate, and foreseeable result, Plaintiffs suffered damages in justifiable reliance on the aforementioned false statements and representations, including pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Ms. Lach for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(as to Defendant, United States Drug Testing Laboratories, Inc.)

164.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

165.  USDTL owed a duty to people like Plaintiffs to reasonably, carefully, and prudently research, develop, test, market, promote, distribute, and utilize its DBS PEth testing and laboratory analyses scheme.

166.  USDTL breached the aforementioned duties.

167.  Each Plaintiff suffered a physical injury (to wit: puncture or laceration of their flesh and extraction of their blood), most if not all more than once, when using the Defendants' DBS PEth testing kits.

168.  As a direct, proximate, and foreseeable result of Plaintiffs' use of the Defendants' DBS PEth testing kits, and USDTL's breaches of duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against United States Drug Testing Laboratories, Inc. for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (as to Defendant, Douglas Lewis)

169.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

170.  Mr. Lewis owed a duty to people like Plaintiffs to reasonably, carefully, and prudently research, develop, test, market, promote, distribute, and utilize USDTL's DBS PEth testing and laboratory analyses scheme.

171.  Mr. Lewis breached the aforementioned duties.

172.  Each Plaintiff suffered a physical injury (to wit: puncture or laceration of their flesh and extraction of their blood), most if not all more than once, when using the Defendants' DBS PEth testing kits.

173.  As a direct, proximate, and foreseeable result of Plaintiffs' use of the Defendants' DBS PEth testing kits, and Mr. Lewis' breaches of duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future;

legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Douglas Lewis for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT VII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (as to Defendant, Joseph Jones)

174.   Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

175.   Dr. Jones owed a duty to people like Plaintiffs to reasonably, carefully, and prudently research, develop, test, market, promote, distribute, and utilize USDTL's DBS PEth testing and laboratory analyses scheme.

176.   Dr. Jones breached the aforementioned duties.

177.   Each Plaintiff suffered a physical injury (to wit: puncture or laceration of their flesh and extraction of their blood), most if not all more than once, when using the Defendants' DBS PEth testing kits.

178.   As a direct, proximate, and foreseeable result of Plaintiffs' use of the Defendants' DBS PEth testing kits, and Dr. Jones' breaches of duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish;

lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Joseph Jones for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

### COUNT VIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(as to Defendant, Michelle Lach)

179.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

180.  Ms. Lach owed a duty to people like Plaintiffs to reasonably, carefully, and prudently market, promote, and facilitate distribution of USDTL's DBS PEth testing and laboratory analyses scheme.

181.  Ms. Lach breached the aforementioned duties.

182. Each Plaintiff suffered a physical injury (to wit: puncture or laceration of their flesh and extraction of their blood), most if not all more than once, when using the Defendants' DBS PEth testing kits.

183. As a direct, proximate, and foreseeable result of Plaintiffs' use of the Defendants' DBS PEth testing kits, and Ms. Lach's breaches of duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Michelle Lach for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT IX: NEGLIGENCE
(as to Defendant, United States Drug Testing Laboratories, Inc.)

184. Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

185.  USDTL owed a duty to Plaintiffs to exercise reasonable care, diligence, and prudence in its research, development, validation, manufacturing, packaging, marketing, promotion, distribution, sale, and commercial use of its DBS PEth testing scheme.

186.  USDTL owed a duty to Plaintiffs to exercise reasonable care, diligence, and prudence in its handling, storage, analysis, interpretation, reporting, and sharing data and/or results from DBS PEth samples collected from donors.

187.  USDTL owed a duty to exercise reasonable care, diligence, and prudence in its training and supervision of donors and collectors involved with its DBS PEth testing scheme.

188.   USDTL owed a duty to ensure that the agents or employees it hired to research, develop, validate, manufacture, package, handle, market, promote, distribute, sell, or otherwise participate in its DBS PEth testing scheme, including but not limited to analyzing samples, interpreting data, and reporting results, were fit for the work at the time they were hired or retained. This included, but was not limited to, Veronica Lewis, Douglas Lewis, Joseph Jones, James R. Lesch, Donna Coy, Priti Soni, Michelle Lach, and Michele Gable (owner of Choice Lab, Inc.).

189.  USDTL owed a duty to ensure that the agents or employees it retained to research, develop, validate, manufacture, package, handle, market, promote, distribute, sell, or otherwise participate in its DBS PEth testing scheme, including but not limited to analyzing samples, interpreting data, and reporting results, continued to be fit for the work after they were hired. This included, but was not limited to, Veronica Lewis, Douglas Lewis, Joseph Jones, James R. Lesch, Donna Coy, Priti Soni, Michelle Lach, and Michele Gable (owner of Choice Lab, Inc.).

190.  USDTL owed a duty to ensure that the agents or employees it utilized to research, develop, validate, manufacture, package, handle, market, promote, distribute, sell, or otherwise participate in its DBS PEth testing scheme, including but not limited to analyzing samples, interpreting data, and reporting results, were reasonably and appropriately supervised and trained. This included, but was not limited to, Veronica Lewis, Douglas Lewis, Joseph Jones, James R. Lesch, Donna Coy, Priti Soni, Michelle Lach, and Michele Gable (owner of Choice Lab, Inc.).

191.  USDTL breached the aforementioned duties.

192.  As a direct, proximate, and foreseeable result of USDTL's breach of its duties, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or

diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against United States Drug Testing Laboratories, Inc. for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT X: NEGLIGENCE
(as to Defendant, Douglas Lewis)

193.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

194.  Mr. Lewis owed a duty to Plaintiffs to exercise reasonable care, diligence, and prudence in his work for USDTL, specifically as it relates to its commercial DBS PEth testing scheme. This duty included, but was not limited to, research, development, validation, manufacturing, packaging, marketing, promotion, distribution, sale, and commercial use of DBS PEth.

195.  Mr. Lewis breached the aforementioned duty.

196.  As a direct, proximate, and foreseeable result of his breach of his duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Douglas Lewis for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT XI: NEGLIGENCE
(as to Defendant, Joseph Jones)

197.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

198.  Dr. Jones owed a duty to Plaintiffs to exercise reasonable care, diligence, and prudence in his work for USDTL, specifically as it relates to its commercial DBS PEth testing scheme. This duty included, but was not

limited to, research, development, validation, manufacturing, packaging, marketing, promotion, distribution, sale, and commercial use of DBS PEth.

199.  Dr. Jones breached the aforementioned duty.

200.  As a direct, proximate, and foreseeable result of his breach of his duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Joesph Jones for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## COUNT XII: NEGLIGENCE
(as to Defendant, Michelle Lach)

201.  Plaintiffs realleges paragraphs 1 through 138 as if alleged herein.

202.  Ms. Lach owed a duty to Plaintiffs to exercise reasonable care, diligence, and prudence in her work for USDTL, specifically as it relates to marketing or promoting its commercial use of DBS PEth testing, which spanned USDTL's website, social media accounts, online presence, YouTube channel, speaking engagements, publication of written research, papers, articles, or journals, and all other media-related engagements.

203.  Ms. Lach breached the aforementioned duty.

204.  As a direct, proximate, and foreseeable result of her breach of her duty, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against Michelle Lach for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all

issues so triable.

## COUNT XIII: VICARIOUS LIABILITY
(as to Defendant, United States Drug Testing Laboratories, Inc.)

205. Plaintiffs realleges paragraphs 1 through 138, 175 through 177, 179 through 181, and 183 through 185, as if alleged herein.

206. Mr. Lewis was an agent, officer, or employee of USDTL.

207. Dr. Jones was an agent, officer, or employee of USDTL.

208. Ms. Lach was an agent, officer, or employee of USDTL.

209. Under the doctrines of respondeat superior or actual agency, USDTL is vicariously liable for the negligence of its agents, officers, and/or employees like Mr. Lewis, Dr. Jones, and Ms. Lach if his/her/their negligence occurred within the course and scope of his/her/their agency and/or employment.

210. Mr. Lewis was negligent in the performance of his duties, role, responsibilities, and obligations as an agent, officer, or employee of USDTL.

211. Dr. Jones was negligent in the performance of his duties, role, responsibilities, and obligations as an agent, officer, or employee of USDTL.

212. Ms. Lach was negligent in the performance of her duties, role, responsibilities, and obligations as an agent, officer, or employee of USDTL.

213. As a direct, proximate, and foreseeable result of his/her/their negligence within the course and scope of his/her/their agency and/or

employment, each plaintiff sustained psychological trauma; pain; suffering; mental anguish; lacerations; extraction of blood; inconvenience; fear; loss or diminishment of the ability to enjoy life; embarrassment; humiliation; damaged reputation; lost wages or earnings or earning opportunities in the past; inability or diminishment of future earning capacity or earning opportunities in the future; legal fees; expert fees; administrative fees; licensure fees; expenses related to mental health, psychiatric, alcohol and/or substance abuse treatment; and expenses related to seeking administrative and/or employment related review, appeals, or reconsideration.

WHEREFORE each of the Plaintiffs demands a judgment against United States Drug Testing Laboratories, Inc. for compensatory damages in an amount exceeding $75,000, exclusive of interests and costs; punitive damages; and a trial by jury on all issues so triable.

## <u>DEMAND FOR TRIAL BY JURY</u>

Each plaintiff requests a trial by jury on all issues so triable.

Dated this 12th day of December, 2022.

Respectfully Submitted By:

Fischer Redavid PLLC
4601 Sheridan Street
Suite 320
Hollywood, FL 33021
Phone: (954) 860-8434
Fax: (954) 860-8584

Service@YourChampions.com (eService only)

/s/ Jordan Redavid, Esq.
**JORDAN REDAVID, ESQ.**
Florida Bar No. 109227
Jordan@YourChampions.com (Primary)
Latricia@YourChampions.com (Secondary)
Crystal@YourChampions.com (Tertiary)
*Lead Counsel for Plaintiffs*

/s/ Keyla J. Smith, Esq.
**KEYLA J. SMITH, ESQ.**
Florida Bar No. 111784
Keyla@YourChampions.com (Primary)
Diana@YourChampions.com (Secondary)